SCOTT J. SAGARIA (BAR # 217981)
ELLIOT W. GALE (BAR #263326)
JOE B. ANGELO (BAR #268542)
SCOTT M. JOHNSON (BAR #287182)
**SAGARIA LAW, P.C.**
2033 Gateway Place, 5th Floor
San Jose, CA 95110
408-279-2288 ph
408-279-2299 fax

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION

| | |
|---|---|
| COLBI TROESTER-MILLER, | CASE NO. |
| Plaintiff, | COMPLAINT FOR DAMAGES: |
| v. | 1. Violation of Fair Credit Reporting Act;<br>2. Violation of California Consumer Credit Reporting Agencies Act; |
| Experian Information Solutions, Inc.; Wells Fargo Bank, National Association; TD Bank USA, National Association and DOES 1 through 100 inclusive, | |
| Defendants. | |

COMES NOW Plaintiff COLBI TROESTER-MILLER, an individual, based on information and belief, to allege as follows:

**INTRODUCTION**

1. This case arises under the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b) and the California Consumer Credit Reporting Agencies Act, California Civil Code §1785.25(a). Plaintiff seeks redress for the unlawful and deceptive practices committed by the Defendants in connection with their inaccurate, misleading, or incomplete reporting of Plaintiff's debt included in Plaintiff's Chapter 7 bankruptcy.

2. The United States Congress has found the banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the

1

banking system, and unfair credit reporting methods undermine the public confidence, which is essential to the continued functioning of the banking system.

3. There exists today in the United States a pervasive and fundamental misunderstanding about the long term impact filing a consumer bankruptcy has on a consumer's credit worthiness. Specifically, many consumers believe that because a bankruptcy can be reported on their credit report for ten years their credit worthiness will be ruined for the same length of time. This is not true.

4. The *majority* of consumer Debtors who file consumer bankruptcy do so to *raise* their FICO Score and remedy their poor credit worthiness.

5. It is entirely possible for consumer Debtors to have over a 700 FICO Score within as little as 12 months after filing a consumer bankruptcy (Chapter 7 or Chapter 13).

6. Creditors and lending institutions are aware of the misconception that filing a consumer bankruptcy destroys a consumer's credit worthiness for ten years.

7. In an effort to perpetuate the aforementioned bankruptcy myth, creditors intentionally and routinely ignore credit reporting industry standards for accurately reporting bankruptcies and debts included in those bankruptcies in an effort to keep consumers' credit scores low and their interest rates high.

8. Creditors know that by deviating from recognized credit reporting standards consumers will have difficulty raising their credit scores and improving their credit worthiness.

9. This was not the intent of Congress when enacting the Fair Credit Reporting Act and the Bankruptcy Abuse Prevention and Consumer Protection Act.

## JURISDICTION & VENUE

10. Plaintiff re-alleges and incorporates herein by this reference the allegations in each and every paragraph above, fully set forth herein.

11. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, and 1367, and 15 U.S.C. § 1681

12. This venue is proper pursuant to 28 U.S.C. §1391(b).

## GENERAL ALLEGATIONS

13. Plaintiff alleges that each and every defendant data furnisher was included in Plaintiff's Chapter 7 bankruptcy filing.

14. Plaintiff alleges that each and every Defendant is familiar with credit reporting industry standards and subscribes thereto.
15. Plaintiff alleges that each and every Defendant understands that deviation from credit reporting industry standards can and often does result in denial of credit, higher interest rates, and prompts those making credit decisions to draw a more negative inference from the reported data than if the Defendants reported in accordance with the recognized industry standard.
16. Plaintiff alleges that all actions alleged herein by Defendants were done knowingly, intentionally, and in reckless disregard for credit reporting industry standards in an attempt to purposefully undermine Plaintiff's fresh start via a Chapter 7 discharge.
17. In the alternative Plaintiff alleges that each and every Defendant's actions was the result of reckless policies and procedures that inevitably led to inaccurate, misleading, or incomplete credit reporting.

   **FICO, Inc.**

18. FICO is a leading analytics software company with its principal headquarters located in San Jose California. FICO has over 130 patents related to their analytics and decision management technology, and regularly uses mathematical algorithms to predict consumer behavior including credit risk.
19. The FICO Score has become the standard measure of consumer credit risk in the United States and is used in ninety percent of lending decisions.
20. A FICO score consists of a three-digit number summarizing a consumer's credit risk or likelihood to repay a loan. FICO periodically updates its scoring models resulting in multiple FICO Score versions.
21. Base FICO Scores range from 300 to 850, while industry-specific FICO Scores range from 250-900. A higher FICO Score demonstrates lower credit risk or less likelihood of default.
22. Different lenders use different versions of FICO Scores when evaluating a consumer's credit worthiness.
23. There are 28 FICO Scores that are commonly used by lenders.

24. A consumer's FICO Score is calculated based solely on information in consumer credit reports maintained at credit reporting agencies (CRAs).
25. The three largest CRAs are Experian Information Solutions, Inc.; Equifax, Inc. and Transunion, LLC.
26. FICO does not control what information is provided on a consumer's credit report. Instead, the scoring models or algorithms are based on the premise that information provided by the CRAs is accurate and complies with credit reporting industry standards.
27. There are five key factors that a FICO Score considers: 1) Payment History 2) Amount of Debt 3) Length of Credit History 4) New Credit and 5) Credit Mix.
28. Each of the five factors is weighted differently by FICO.
29. 35% of a consumer's FICO Score relates to payment history, 30% relates to the amount of debt, 15% relates to the length of credit history, 10% relates to new credit, and the last 10% relates to a consumer's credit mix or the different types of debts reported.
30. Payment history refers to whether a consumer has paid their bills in the past, on time, late or missed payments. The more severe, recent, and frequent the late payment information, the greater the impact on a FICO Score.  Public record items such as bankruptcy, foreclosure, judgments, and wage garnishments are also considered part of a consumer's payment history.
31. In factoring the severity of delinquent payments a FICO Score considers how late the payment continues to be, how much is owed, how recently this occurred, and how many delinquent accounts exist.
32. Once a delinquent account has been remedied the longer the account stays current the more a consumer's FICO Score should increase.
33. FICO Scores are entirely dependent upon information provided by data furnishers (DFs) to CRAs.
34. The FICO scoring formula treats both Chapter 7 and Chapter 13 Bankruptcies similarly in terms of their impact on one's FICO Score. Specifically, both Chapters have the same level of severity with respect to their FICO Score and for both, FICO uses the FILING DATE to determine how long ago the bankruptcy took place.

**Metro 2**

35. The Consumer Data Industry Association is an international trade association representing the consumer credit, mortgage reporting, employment and tenant screening and collection service industries.
36. The credit reporting industry has adopted a standard electronic data reporting format called the Metro 2 format. The Metro 2 format was developed by the CDIA in an effort to universally report debts in a particular manner that is understood to be the most accurate way in which to report a debt. Specifically, Metro 2 format was designed to allow reporting of the most accurate and complete information on consumer's credit history.
37. The CDIA's Metro 2 format is the credit reporting industry standard for accurate credit reporting.
38. The credit reporting industry at large depends upon Metro 2 and the CDIA's recommendations for reporting debt accurately.
39. The CDIA is *The* expert on accurate credit reporting. In support of this allegation Plaintiff avers the following:
    a. The CDIA offers a FCRA certificate program for all CRAs.
    b. The CDIA offers a FCRA awareness program for all CRAs.
    c. The CDIA offers a FCRA Certificate program for DFs.
    d. The CDIA offers a FCRA awareness program for DFs.
    e. The CDIA offers a Metro 2 Learning system to provide detailed instructions on the use of Metro 2 format to ensure understanding of the reporting guidelines for each field of the Metro 2 Format as well as the relationship between multiple fields.
    f. The CDIA hosts workshops developed and authorized by Equifax, Experian, Innovis, and Transunion.
    g. The CDIA developed a credit reporting resource guide for accurately reporting credit.
40. The CDIA's Metro 2 is accepted by all CRAs.
41. The credit reporting accepted industry standards for reporting metro 2 accurately are found in the CDIA's credit reporting resource guide (CRRG).

42. The CRRG outlines the industry standards for most accurately reporting debts using Metro 2.
43. The CRRG is not readily available to the public. It can be purchased online for $229.45.
44. Even if a buyer is ready willing and able to pay for the CRRG, the CDIA will NOT grant access to the guide unless the buyer represents an organization included in the Metro 2 Access Policy.
45. When FICO calculates credit scores the algorithms use Metro 2 information based on industry standards established by the CDIA.
46. The algorithms used by FICO in determining a consumer's credit score are premised on the Metro 2 data received comporting with the CDIA's recommendations for accurate credit reporting.
47. If the Metro 2 data received by FICO deviates from industry standards an inaccurate or incorrect FICO Score results. If the resulting FICO Score is lower a consumer will be considered a higher credit risk resulting in less favorable lending terms.

### e-OSCAR

48. E-OSCAR is the web based Metro 2 compliant system developed by Experian Information Solutions, Inc.; Equifax, Inc.; TransUnion, LLC and Innovis that enables DFs and CRAs to create and respond to consumer credit disputes
49. When a consumer sends a dispute letter to a CRA the CRA then sends an automated credit dispute verification (ACDV) via e-Oscar to the DF.
50. The ACDV contains within it Metro 2 codes next to certain data fields associated with a credit file e.g. "Account Type" "07" (07 in Metro 2 refers to a Charge Account)

### Bankruptcy Credit Reporting Industry Standards & Consumer Information Indicator

51. When a consumer files bankruptcy certain credit reporting industry standards exist.
52. Certain Metro 2 data is regularly expected and calculated by FICO when determining a consumer's credit worthiness.
53. The Consumer Information Indicator (CII) is a critical field in the Metro 2 Format that indicates a special condition that applies to a specific consumer.

54. Under Metro 2 the CII must be reported only on the consumer to whom the information applies.
55. It is the credit reporting industry standard to report a very specific CII upon the filing of a consumer bankruptcy.
56. In the consumer bankruptcy context CII Metro 2 Code "A" denotes that a petition for Chapter 7 has been filed, is active, but no discharge has been entered.
57. The CII Metro 2 Code "Z" indicates that a bankruptcy petition has been filed but the chapter is undesignated/unknown.
58. The CII Metro 2 Code "E" denotes that a Chapter 7 bankruptcy has been discharged.
59. The CII field is a critical field for consumers and directly relates to and impacts a consumer's credit worthiness.
60. Failure to report the correct CII indicator will prompt those making credit decisions to draw a more negative inference regarding a consumer's credit worthiness.
61. A consumer's FICO Score is directly related to the date on which a petition is filed and acknowledged. The more time that has passed since the filing of the bankruptcy, the less negative impact the bankruptcy will have on a consumer's FICO Score.
62. Failure to reference the bankruptcy filing (CII field) and or the correct petition date shall result in a lower FICO Score resulting in those making credit decisions to draw a more negative inference regarding a consumer's credit worthiness.

**Bankruptcy Credit Reporting Industry Standards & Payment history**

63. When a consumer files bankruptcy certain credit reporting industry standards exist on how to properly report a consumer's payment history.
64. The *filing* of a consumer bankruptcy constitutes an *order of relief* under 11 U.S.C § 301(b) and represents the watershed moment in a consumer's bankruptcy.
65. The order of relief's enforcement mechanism is the automatic stay of 11 U.S.C. §362 which stays or prohibits numerous creditor activities including any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case.
66. When entered, a discharge under 11 U.S.C. § 727 applies only to those debts that arose before the order of relief under 11 U.S.C. §301(B) i.e. pre-petition debts.

67. Outside the bankruptcy context, the recognized credit reporting industry standard for reporting timely payments in a consumer's payment history profile is to report the metro 2 code "0."
68. In metro 2 the "0" denotes that a payment was owed and received timely. A lengthy payment history showing timely payments results in a higher Fico Score or more favorable credit worthiness rating. Generally, when a "0" is reported the CRA's reflect the 0 as an "ok" notation in a consumer's payment history profile.
69. Outside the bankruptcy context, in metro 2 a "1" denotes that an account is 30-59 days past due. Generally, when a "1" is reported the CRAs reflect the "1" as a "30" (30 days late) in the payment history section.
70. Outside the bankruptcy context, in metro 2 a "2" denotes an account is 60-89 days past due. Generally, when a "2" is reported the CRAs reflect the "2" as a "60" (60 days late) in the payment history section.
71. Outside the bankruptcy context, in metro 2 a "3" denotes 90-119 days past due reflected by a "90" in the payment history; a "4" denotes an account 120-149 days past due reflected by a "120" in the payment history; a "5" denotes an account is 150-179 days past due and reflected by a "150" in the payment history, a "6" denotes an account is 180 days past due; and an "L" denotes a charge off and reflected by a "CO" or "negative" in the payment history section.
72. In the bankruptcy context, the recognized credit reporting industry standard for reporting payment history post-petition but pre discharge is to report the Metro 2 indicator "D." In metro 2 the "D" in the payment history profile reflects that no payment history is available.
73. The Metro 2 indicator "D" represents the most complete and accurate way in which to report the payment status of an account post-petition pre discharge. Specifically, the indicator "D" simultaneously illustrates that no payment was received; and in addition that the DF was not anticipating payment, nor would a DF accept payment directly from a consumer due to the automatic stay provisions of the bankruptcy code.
74. Failure to adhere to the recognized credit reporting industry standards shall lower a consumer's Fico Score resulting in those making credit decisions to draw a more negative inference regarding a consumer's credit worthiness.

**Plaintiffs Bankruptcy Filing**

75. Prior to filing Chapter 7, Plaintiff pulled a credit report on October 13, 2014 to ensure all outstanding debt was properly listed and scheduled in Plaintiff's petition.
76. The credit report was pulled from a third party vendor CIN Legal Data Services.
77. Plaintiff alleges that all the information contained within the October 13, 2014 CIN report was compiled by information gathered by CIN directly from the three major CRAs- Experian Information Solutions, Inc.; Equifax, Inc. and Trans Union, LLC.
78. The CIN report contained within it Plaintiff's estimated credit score of 622 based on the information provided by the CRAs.
79. The CIN report also estimated Plaintiff's 12-month post-bankruptcy credit score at 657.
80. Plaintiff alleges such scores were based on anticipated accurate credit reporting industry standards.
81. Plaintiff filed for Chapter 7 bankruptcy protection on October 30, 2014 in order to reorganize and repair Plaintiff's credit worthiness and FICO Score.
82. Post filing, Defendants would not accept payments directly from Plaintiff.
83. Post filing, Defendants were not anticipating receiving payments directly from Plaintiff.
84. Plaintiff's bankruptcy was discharged on February 17, 2015.
85. On June 2, 2015 Plaintiff ordered a three bureau report from Equifax, Inc. to ensure proper reporting by Plaintiff's Creditors.
86. Plaintiff noticed *2* different trade lines on the June 2, 2015 credit report all reporting inaccurate, misleading, or incomplete information that did not comport with credit reporting industry standards.  Specifically, multiple trade lines continued to report Plaintiff's accounts as in collections, and/or charged off.
87. In response, Plaintiff disputed the inaccurate tradelines via certified mail with Experian Information Solutions, Inc.; Equifax, Inc.; and TransUnion, LLC on July 2, 2015.
88. Plaintiff's dispute letter specifically put each Creditor on notice that Plaintiff had filed for bankruptcy and the account was not reporting the bankruptcy accurately or worse not at all. Plaintiff specifically requested each Creditor investigate the proper way to report Plaintiff's bankruptcy. Plaintiff noted that there should not be any past due balance reported, the account should not be listed as charged off, transferred or sold,

with an inaccurate monthly payment or that the account is in collections. There should not be any late payments reported after Plaintiff's case was filed and all creditors receiving a dispute needed to investigate how to properly report the debt after a Chapter 7 bankruptcy filing. Last, Plaintiff noted that under *Gorman v. Wolpoff & Abramson*, Plaintiff expected the accounts to be reported disputed if the Creditor disagreed with Plaintiff's dispute.

89. Plaintiff is informed and believes that each CRA received Plaintiff's dispute letter and in response sent Plaintiff's dispute to each DF via an ACDV through e-OSCAR.

90. On August 7, 2015 Plaintiff ordered a second three bureau report from Equifax, Inc. to ensure Plaintiff's accounts had been updated.

91. On December 14, 2016 Plaintiff ordered a third three bureau report from Equifax, Inc. to ensure Plaintiff's accounts had been updated.

92. Defendant Wells Fargo Bank, National Association was reporting Plaintiff's account, beginning in 5490xxxx, as in collections and charged off.

93. The account is not with a past due balance and, therefore, cannot be in collections. The account status showing as in collections is inaccurate and facially inaccurate.

94. Moreover, Defendant is not comporting with industry standards and is not listing the correct CII. The CII should have been updated to E instead kept as charged off and/or in collections.

95. Defendant TD Bank USA, National Association was reporting Plaintiff's account, beginning in 4352xxxx, as in collections and charged off.

96. The account is not with a past due balance and, therefore, cannot be in collections. The account status showing as in collections is inaccurate and facially inaccurate.

97. Moreover, Defendant is not comporting with industry standards and is not listing the correct CII. The CII should have been updated to E instead kept as charged off and/or in collections.

98. This account has been discharged and TD Bank has steadfastly refused to acknowledge the discharge.

99. The actions of the Defendants as alleged herein are acts in violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b).

100. The actions of the Defendants as alleged herein are acts in violation of the Consumer Credit Reporting Agencies Act California Civil Code § 1785.25(a).

**FIRST CAUSE OF ACTION**
(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681s-2(b))
Against Defendants and Does 1-100)

**Wells Fargo Bank, National Association and TD Bank USA, National Association –Failure to Reinvestigate.**

101. Plaintiff realleges and incorporates herein the allegation in each and every paragraph above as though fully set forth herein.

102. 15 USC 1681s-2(b) and 15 USC 1681i-(a)1 prohibits furnishers from providing any information relating to a consumer to any consumer reporting agency if the person knows or has reasonable cause to believe that the information is inaccurate or misleading and requires a furnisher to update and or correct inaccurate information after being notified by a consumer reporting agency of a dispute by a consumer.

103. Defendants Wells Fargo Bank, National Association and TD Bank USA, National Association violated section 1681s-2(b) by failing to conduct a reasonable investigation and re-reporting misleading and inaccurate account information.

104. The CRAs provided notice to the Defendants that Plaintiff was disputing the inaccurate and misleading information but Wells Fargo Bank, National Association and TD Bank USA, National Association failed to conduct a reasonable investigation of the information as required by the FCRA.

105. Based on Plaintiff's dispute, Defendants should have known their accounts were included in Plaintiff's Chapter 7 bankruptcy. The most basic investigation would include a simple review of well-established credit reporting industry standards.

106. Plaintiff alleges Defendants did not review well established industry standards for credit reporting.

107. If Defendants had reviewed such standards Defendants would have seen their reporting was not in compliance and consequently inaccurate and or incomplete.

108. Such an investigation would be unreasonable.

11

109. Plaintiff also alleges that Defendants did not investigate whether Plaintiff filed for bankruptcy or whether their accounts were included.
110. The lack of investigation is unreasonable.
111. Plaintiff further alleges that neither DF has properly trained those directly investigating disputes on Metro 2 generally or credit reporting industry standards and as such have developed reckless policies and procedures.

**Experian Information Solutions, Inc.– Failure to Reinvestigate Disputed Information.**

112. Plaintiff realleges and incorporates herein the allegation in each and every paragraph above as though fully set forth herein.
113. After Plaintiff disputed the accounts mentioned above, each CRA was required to conduct a reasonable investigation and to delete any information that was not accurate under 15 USC 1681i-(a)1.
114. The most basic investigation required each CRA to send all relevant information via an ACDV to the furnishers which they did not do.
115. Thus the CRAs failed to conduct a reasonable investigation and failed to correct the misleading and or inaccurate statements on the account within the statutory time frame or at all.
116. In the alternative Plaintiff alleges that each CRA has its own independent duty to conduct a reasonable investigation 15 USC 1681i-(a)1.
117. Each CRA is not a passive entity bound to report whatever information a DF provides.
118. Plaintiff alleges that each CRA is readily familiar with Metro 2 guidelines and credit reporting industry standards.
119. *In fact, each CRA sponsors and authorizes workshops hosted by the CDIA that teach the following to DFs*:
    a. Do not report delinquencies post petition pre discharge in the payment history section regardless of Chapter 7 or Chapter 13. Instead report the Metro 2 indicator D.
    b. In Chapter 13 cases do not report past due balances post confirmation.

    c. In Chapter 13 cases do not report balances that are inconsistent with the terms of the Chapter 13 plan.

    d. In Chapter 13 cases do not report monthly payments that are inconsistent with the terms of the Chapter 13 plan.

    e. The above reporting is the correct and accurate way to report debts included in consumer bankruptcy filings.

120. Given the aforementioned, Plaintiff alleges that each CRA can and does suppress inaccurate information from being reported when DFs provide inaccurate information.

121. Each CRA can and does instruct DFs on how to properly report certain accounts from time to time upon request from the DF.

122. Each CRA failed to conduct a reasonable investigation because any basic investigation would have uncovered that certain DFs were not following credit reporting industry standards.

123. Each CRA would have known that Plaintiff filed for Chapter 13 based on multiple other accounts reporting as much.

124. Each CRA would have known that Plaintiff's plan had been confirmed based on multiple other accounts reporting as much.

125. Each CRA would have known that failure to report a CII given that a Chapter 13 was filed did not comport with industry standards.

126. Each CRA would have known reporting a past due balance post confirmation does not comport with industry standards.

127. Each CRA therefore did not do the most basic investigation regarding credit reporting industry standards otherwise the aforementioned would have been uncovered.

**SECOND CAUSE OF ACTION**
(Violation of California Consumer Credit Reporting Agencies Act
California Civil Code § 1785.25(a) Against Defendants and Does 1-100)

**Wells Fargo Bank, National Association and TD Bank USA, National Association – Reporting Inaccurate Information to CRAs.**

128. Plaintiff realleges and incorporates herein the allegation in each and every paragraph above as though fully set forth herein.

129. In the regular course of its business operations, Defendants routinely furnish information to credit reporting agencies pertaining to transactions between Defendants and Defendant's consumers, so as to provide information to a consumer's credit worthiness, credit standing and credit capacity.

130. Defendants intentionally and knowingly reported misleading and inaccurate account information to the CRAs that did not comport with well-established industry standards.

131. Plaintiff alleges that Defendants re-reported the information contained herein in violation of California Civil Code § 1785.25(a).

132. Plaintiff also alleges that Defendants had reason to know that the information reported on Plaintiff's accounts were misleading, inaccurate, incomplete, and did not comport with well-established credit reporting industry standards.

133. Plaintiff alleges that Defendants had reason to know that by not comporting with well-established industry standards lenders will draw a more negative inference with respect to Plaintiff's credit worthiness.

134. Plaintiff alleges that the bankruptcy notices, disputes letters from all three credit reporting agencies, the consumer data industry resource guide, the language in the Chapter 7 filing and subsequent discharge order issued by the U.S. Bankruptcy Court, and results of its investigation should have provided notice to Defendants of their misleading and inaccurate reporting as well as being noticed of the proof of claim forms sent by the U.S. Bankruptcy Court.

135. Defendants failed to notify Experian Information Solutions, Inc. that the information Defendant re-reported was inaccurate before the end of 30 business days, in violation of California Civil Code § 1785.25(a).

136. Defendants' communications of false information, and repeated failures to investigate, and correct their inaccurate information and erroneous reporting were done knowingly, intentionally, and in reckless disregard for their duties and Plaintiff's rights.

137. As a direct and proximate result of Defendants' willful and untrue communications, Plaintiff has suffered actual damages including but not limited to inability to properly reorganize under Chapter 7, reviewing credit reports from all three consumer reporting agencies, time reviewing reports with counsel, sending demand letters, diminished credit score, and such further expenses in an amount to be determined at trial.

Wherefore, Plaintiff prays for judgment as hereinafter set forth.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

1. For preliminary and permanent injunctive relief to stop Defendants from engaging in the conduct described above;
2. Award statutory and actual damages pursuant to 15 U.S.C. § 1681n and California Civil Code § 1785.31;
3. Award punitive damages in order to deter further unlawful conduct pursuant to 15 U.S.C. § 1681n; and California Civil Code § 1785.31
4. Award attorney's fees and costs of suit incurred herein pursuant to 15 U.S.C. § 1681n & o; California Civil Code § 1785.31;
5. For determination by the Court that Creditor's policies and practices are unlawful and in willful violation of 15 U.S.C. § 1681n, et seq.; and
6. For determination by the Court that Creditor's policies and practices are unlawful and in negligent violation of 15 U.S.C. § 1681o;

Dated: January 26, 2017

**SAGARIA LAW, P.C.**
*/s/ Elliot Gale, Esq.*
Scott Sagaria, Esq.
Elliot Gale, Esq.
Attorneys for Plaintiff

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands trial of this matter by jury.

Dated: January 26, 2017

**SAGARIA LAW, P.C.**
*/s/ Elliot Gale, Esq.*
Scott Sagaria, Esq.
Elliot Gale, Esq.
Attorneys for Plaintiff